**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION**

IN RE:

P&J RESOURCES, INC.                                                   CASE NO. 10-70470

DEBTOR

RAYMOND E. FONTAINE TRUST, ET AL.                                     PLAINTIFFS

V.                                                ADV. CASE NO. 10-7079 (LEAD CASE)
                                                  PROCEDURALLY CONSOLIDATED WITH
                                                            ADV. NO. 10-7080

P&J RESOURCES, INC., ET AL.                                          DEFENDANTS

**MEMORANDUM OPINION**

At issue is whether the Defendant Debtors, Richard and Pamela Williams (collectively

the "Williams") and P&J Resources, Inc. ("P&J"), conducted an elaborate scheme to induce Mr.

Raymond Fontaine and his friends and family, in their own right or as successors-in-interest to

Mr. Fontaine, to invest millions of dollars in non-existent or ultimately worthless gas wells,

thereby committing fraud in the inducement, conversion, and breach of contract for which the

Plaintiffs are entitled to actual and/or punitive damages.  If so, the second issue is whether the

Williams should be held jointly and severally liable for these acts by virtue of their own tortious

conduct and/or by piercing the corporate veil of P&J.  Third, this Court must decide whether the

assignments of well interests from P&J to the Plaintiffs fail to reflect the intent of the parties and

should be reformed based on mutual mistake.

The Court conducted a three day trial on these issues which concluded on December

19, 2011.  Upon consideration of the parties' stipulation of facts, testimony and exhibits admitted

into evidence, arguments of counsel, proposed findings of fact and conclusions of law, post-trial

briefs and the record, the Court finds that the Defendants fraudulently induced Mr. Fontaine and

the Plaintiffs to invest in non-existent and worthless gas wells.  As part of this scheme, the

Plaintiffs have proven that the Defendants also converted thousands of dollars of the Plaintiffs'

investment money for their own use and breached the contracts between the Defendants and

the Plaintiffs when P&J ultimately failed to perform as promised.

Furthermore, it is apparent from the evidence at trial that not only should the Williams be

held personally liable for their own tortious conduct, namely fraud and conversion, but they

cannot hide behind P&J for its breach of contract where P&J is merely an alter ego used to

perpetuate this fraud.

Finally, the Court finds that the Plaintiffs have failed to meet their burden that the

assignments should be reformed based on mutual mistake because the mistake alleged is

apparent on the face of the Letter Agreements and Assignments upon which the Plaintiffs rely.

## Procedural History

This matter arose out of a contract dispute over payments for interests in gas wells in

eastern Kentucky.  The litigation began with a complaint filed by the Plaintiffs on November 24,

2008, in the United States District Court for the Eastern District of Kentucky (the "District Court

Complaint") alleging fraud and breach of contract claims against the Defendants P&J, a

Kentucky oil and gas drilling company; Pamela Williams, the sole owner and president of P&J;

and her husband, Richard Dow Williams, the vice-president of operations for P&J.  The

Plaintiffs' action is based on a relationship between the now-deceased Raymond E. Fontaine, a

wealthy entrepreneur from Massachusetts, and the Williams, through P&J, whereby Mr.

Fontaine invested millions of dollars in gas wells located in eastern Kentucky and in turn

assigned his interest in those wells to the Plaintiffs, many of whom also personally invested in

the wells.  The Plaintiffs include the following:

(1) the Raymond E. Fontaine Trust, dated 12/22/88, as amended, by and
through Jean Webster, Patricia Fontaine, Kathleen Fowler and Mary
Fontaine Carlson, Successor Co-Trustees (the "Fontaine Trust");

2

(2)   the MPJ Fontaine Trust, U.A. DTD, dated 10/26/98, by and through Jean Webster, Patricia Fontaine, and Mary Fontaine Carlson, Co-Trustees (the "MJP Trust");

(3)   Mr. Fontaine's three daughters and their respective spouses: Mary Fontaine and Robert Carlson, Jean and Gary Webster, and Patricia Fontaine;

(4)   Mr. Fontaine's four grandchildren, or Nora Carlson (through the Nora Carlson Irrevocable Trust, by and through Robert Carlson, and Mary Fontaine Carlson, Co-Trustees), Tyler Webster, Adam Webster, and Dylan Klempner;

(5)   Mr. Fontaine and/or his wife's caregivers: Joan Casartello, Rosemary Hillery, and Arlene Everett;

(6)   the R.E. and M.V. Fontaine Family Foundation, Inc. (the "Fontaine Foundation"); and

(7)   Patricia Carlucci Schwartz, the Raymond Street, Group, LLC, Cherry Driveway, LLC, and the Piaker Family Irrevocable Trust, by and through Matthew Piaker, Alan Piaker, and Susan Piaker, Co-Trustees (the "Piaker Trust"), all of which are friends of Mr. Fontaine and his family members individually or as members of certain business entities.

Following Mr. Fontaine's death, the Plaintiffs by and through Robert Carlson, began investigating Mr. Fontaine's investments with P&J.  During this investigation, the Plaintiffs started to suspect that the Williams and P&J duped Mr. Fontaine and the Plaintiffs into investing in non-existent or worthless well interests.  This suspicion ultimately led to the filing of the District Court Complaint seeking damages from P&J and the Williams directly for breach of contract, fraud, and conversion.

Approximately a year after filing the District Court Complaint, the Plaintiffs moved for summary judgment on their breach of contract claims.  On April 15, 2010, the District Court granted the Plaintiffs' motion for partial summary judgment[1] on the Plaintiffs' claims for breach of contract for (1) contracts with the so-called 30-Month and 100 Mcf Guarantees (explained more

---

[1] The effect of the District Court's judgment in this action is discussed *infra*.

fully herein) and (2) a loan by Mr. Fontaine to P&J in 2004 to construct Section 8 Housing and

Urban Development apartments.  The District Court denied the Plaintiffs' summary judgment

motion seeking to pierce the corporate veil of P&J because there remained material issues of

genuine fact related to the Plaintiffs' fraud claim, which was not the subject of the motion,

including the material issue of whether the Plaintiffs could link their contractual injury to the

Williams' misuse of the corporate form.  A status conference was set for June 17, 2010.

The District Court action was stayed when, on June 11, 2010, P&J filed a Chapter 11

bankruptcy petition [Case No. 10-70470].  On June 30, 2010, the Plaintiffs moved for

modification of the automatic stay to seek authorization for the District Court action to proceed

to trial.  The motion was denied. On September 30, 2010, following a fire that destroyed P&J's

records (which had been previously ordered to be delivered to the Plaintiffs), P&J's Chapter 11

bankruptcy was converted to a Chapter 7 bankruptcy pursuant to 11 U.S.C. §1112(b)(4)(C) for

cause, including P&J's failure to maintain adequate insurance.

Also on September 30, 2010, the Williams filed a second petition for Chapter 12 relief

[Case No. 10-70767].[2]  In December, the Plaintiffs moved to convert the Williams' case from a

Chapter 12 to a Chapter 7, alleging that the Williams misrepresented and concealed assets

from creditors.  Following a lengthy evidentiary hearing, on June 1, 2011, this Court found that

the Williams committed fraud in connection with their case and converted the Chapter 12 case

to a Chapter 7 case pursuant to 11 U.S.C. §1208(d) (the "Conversion Order").[3]

In the meantime, on December 30, 2010, the Plaintiffs filed identical complaints (the

"Adversary Complaints") against the Williams [Adv. No. 10-7080] and P&J [Adv. No. 10-7079]

seeking judgment against P&J and the Williams, jointly and severally, on various counts for

---

[2] The Williams' first Chapter 12 case [Case No. 10-70650] was dismissed for their failure to timely obtain credit counseling.

[3] The Williams' appeal of the Court's June 23, 2011 Order denying their Motion to Reconsider was dismissed on January 30, 2012 [Doc. 310 of Case No. 10-70767].

breach of contract, fraud, and conversion.  The Adversary Complaints have been procedurally

consolidated.  In particular, the Plaintiffs ask this Court to:

> (1)  reform the Well Assignments to correctly reflect the interests
> purchased by Mr. Fontaine (Count I);
>
> (2)  give the District Court's order granting partial summary
> judgment on the Plaintiffs' breach of contract claims related to wells
> with Guarantees *res judicata* effect and award damages based on
> the same (Counts II, III, and V);
>
> (3)  award damages arising from breach of contracts related to the
> undrilled wells and failure to pay shut-in royalties (Count IV);
>
> (4)  find P&J and the Williams liable for fraud and award damages
> (Count VI);
>
> (5)  find P&J and the Williams liable for conversion and award
> damages (Count VII);
>
> (6)  order the Defendants to provide an accounting to the Plaintiffs
> (Count VIII);
>
> (7)  pierce the corporate veil and hold the Williams jointly and
> severally liable for all money damages owed by P&J (Count IX);
>
> (8)  find that the debts owed by the Williams to the Plaintiffs are
> non-dischargeable pursuant to 11 U.S.C. §523(a)(2), §523(a)(4),
> and §523(a)(6) (Counts X, XI, XII); and
>
> (9)  deny the Williams their discharge pursuant to 11 U.S.C. §727
> (Counts XIII, XIV, XV, XVI, and XVII).

On March 16, 2011, the Williams filed an Answer denying the Plaintiffs' allegations.  P&J

never answered or otherwise responded to the Plaintiffs' Complaint.[4]

On June 20, 2011, the Plaintiffs moved for summary judgment herein on their claims

seeking a denial of the Williams' discharge pursuant to §727(a)(2) (Count XIII) and §727(a)(4)

(Count XV).  The Plaintiffs argued that the Williams were collaterally estopped from contesting

these allegations by the Conversion Order's finding the Williams had committed fraud in

---

[4] Prior to trial, the Plaintiffs' moved for a default judgment against P&J [Doc. 102].  The Court reserved
ruling on the Motion until the conclusion of trial [Doc. 123] and this ruling is discussed *infra*.

connection with their bankruptcy case.  On October 5, 2011, the Court agreed and granted

partial summary judgment to the Plaintiffs, thereby denying the Williams a Chapter 7 discharge

and resolving and/or mooting Plaintiffs' claims in Counts X-XVII.

The Plaintiffs' remaining claims for (1) reformation of the Assignments (Count I); (2)

damages based on P&J's breach of contract (Counts II, III, and IV); (3) fraud (Count VI); (4)

conversion (Count VII); and (5) accounting (Count VIII)[5] were tried over three days in December

of 2011.  Following the filing of post-trial briefs and proposed findings of fact and conclusions of

law, the matter was submitted for decision on January 17, 2012.

### Findings of Facts

Mr. Fontaine made his first investment with P&J in 2002.  From 2002 until his death in

June of 2007, Mr. Fontaine, and subsequently the Plaintiffs, made investments of approximately

$7 million in wells with P&J.[6]  During this time period, Mr. Fontaine and the Plaintiffs, in their

own right and as his successors-in-interest, provided the capital for approximately 65 wells.

**A.     The Initial Investments**

By way of background, much of the oil and gas in the Central Appalachian Basin is

developed by producers who lease the oil and gas from the landowner.  The landowner is paid a

royalty, commonly 1/8 (or 12.5%) of the value of the produced oil and gas.  The leasehold

interest, as it relates to a particular well, is called the "working interest" and is essentially the

ownership of the well.  The revenue remaining after the deduction of the landowner's royalty

and any other overriding royalties is called the "revenue interest."  When interests in wells are

---

[5] At trial, the Plaintiffs did not ask for relief associated with its Count VIII, or an accounting of the
Defendants' holdings.  The Plaintiffs also failed to address Count VIII in its post-trial brief.  The Court
therefore assumes that this Count has been waived by the Plaintiffs and shall not address it herein.

[6] The Plaintiff's damages expert, Elizabeth Z. Woodward, testified that the total cash payments made by
the Plaintiffs to P&J were $10,953,700.00.   Approximately $4 million of these payments were related to
the Fontaine Williams Gas Gathering System, LLC, a joint venture between the Williams and Mr. Fontaine
to build their own pipeline to transport gas, discussed more fully herein.

conveyed, the conveyance typically states both the working interest and the revenue interest being conveyed.

Mr. Fontaine was the first and primary investor in P&J's wells.  Prior to investing with P&J, Mr. Fontaine made his living as a successful New England entrepreneur in the construction business.  He had little to no experience in investing in oil and gas wells.  By the time he made his first investment with P&J, Mr. Fontaine was in his eighties and divided his time between Massachusetts and Florida.

Mr. Fontaine met Mr. Williams through Harry Thompson, another businessman involved in the oil and gas business, and Mr. Fontaine's son-in-law, Gary Webster.  Mr. Thompson and Mr. Webster visited Mr. Williams at his farm to view two of Mr. Williams' gas wells.  Mr. Webster told Mr. Williams that his father-in-law, Raymond Fontaine, was interested in investing in gas. Shortly thereafter, Mr. Fontaine contacted Mr. Williams about investing.   From that point forward, Mr. Fontaine and Mr. Williams corresponded through letters, emails, and telephone, never meeting in person.

Mr. Fontaine's first investment with P&J began with a purchase of interests in the Circle J #4 and #5 Wells.  On September 24, 2002, Mr. Fontaine executed a letter agreement with P&J related to the Circle J Farm #4 and #5 Wells (the "Circle J #4 and #5 Letter Agreement").  The Circle J #4 and #5 Letter Agreement states, in pertinent part,

> This letter when accepted by you in the space provided below shall constitute our agreement as to the completion of wells located in Magoffin County, Kentucky and designated as Circle J Farm Well No. 4 and Circle J Farm Well No. 5.
>
> In consideration of your advancing the sum of One hundred thirty-five thousand dollars ($135,000.00) for each well, as above designated, you shall receive fifty percent (50%) of eighty-one and one-half percent (81.5%) working interest in each well.
>
> You shall receive seventy-five percent (75%) of the net revenue produced by each well until you have received a total of the sum of Two hundred seventy thousand dollars ($270,000.00), designated as "payout."  After

7

"payout" you shall receive fifty percent (50%) of the net revenue produced by each well.

The Circle J #4 and #5 Letter Agreement was prepared by the Williams and was signed by both

Mr. Fontaine and Richard Williams on behalf of P&J.

Mr. Fontaine transferred $270,000.00 to P&J.  An Assignment of a working interest in

the Circle J Farm #5 Well to Mr. Fontaine was prepared by the Williams, signed by Pamela

Williams on behalf of P&J, and recorded with the Magoffin County Clerk's Office.  The

Assignment stated in relevant part:

> THIS ASSIGNMENT, made and entered into this 24th day of September, 2002, by and [sic] P&J Resources, Inc., hereinafter referred to as Assignor and Raymond E. Fontaine, hereinafter referred to as Assignee.
>
> WITNESSETH:  That for and in consideration of the sum of One Dollar ($1.00) cash in hand paid and other good and valuable considerations all of which is hereby acknowledged, Assignor does hereby assign, transfer and set over unto Assignee a fifty-percent (50%) of eighty-one and one-half percent (81.5%) working interest in the Circle J Farms Well No. 5, Magoffin County, Kentucky and located on the property described in Book 30, at page 618, Magoffin County records, Magoffin County, Kentucky.

Similarly, an Assignment of a working interest in the Circle J Farm #4 Well to Mr. Fontaine was

prepared by the Williams, signed by Pamela Williams on behalf of P&J Resources, Inc., and

recorded with the Magoffin County Clerk's Office.

Mr. Fontaine assigned his interest in the Circle J Farm #4 Well to Rosemary Hillery.

P&J made payments to Mr. Fontaine totaling $102,188.77 based on reported production from

the Circle J Farm #4 Well.  Mr. Fontaine subsequently assigned his interest in the Circle J Farm

#5 Well to the Fontaine Trust.  P&J ultimately made payments to Mr. Fontaine totaling

$100,118.12 based on reported production from the Circle J Farm #5 Well.

Mr. Fontaine purchased two additional wells on November 8, 2002.  He paid a total of

$270,000.00 for interests in Circle J #1 and Circle J #2 Wells (the "Circle J #1 and #2 Letter

Agreement").  This time, the deal he struck with P&J was slightly different.  In addition to

8

agreeing to "fifty percent (50%) of eighty-one and one-half percent (81.5%) working interest in

each well," and "seventy-five percent (75%) of the net revenue produced" until payout and then

"fifty percent (50%) of the net revenue produced by each well," Mr. Fontaine and P&J agreed

that Mr. Fontaine would receive two guarantees that were provisions in many but not all the well

agreements.  In the Circle J #1 and #2 Letter Agreement, P&J agreed to repay Mr. Fontaine his

entire capital investment within thirty months after the well went into production.  This was

memorialized as follows ("30 Month Guarantee"):

> P&J Resources, Inc., shall provide you on the anniversary of the thirtieth
> (30th) month after the wells are placed into production an accounting of the
> amount you received in the form of production payments.  In the event you
> have not received your total investment on or before the thirtieth (30th)
> month, as mentioned above, P&J Resources, Inc. shall pay you, on or
> before the tenth (10th) day following the anniversary date aforesaid, the
> difference between your investment and the amount paid to you based
> upon the production of the wells.

The Circle J #1 and #2 Letter Agreement also promised to pay based on a production of

100,000 cubic feet of gas ("Mcf")[7] per day pursuant to the following language ("100 Mcf

Guarantee"):

> P&J Resources, Inc., shall guarantee to pay you based upon the
> production of 100,000 cubic feet of gas per day for each well, cumulatively
> or collectively.

The Circle J #1 and #2 Letter Agreement was signed by Mr. Fontaine on November 8, 2002, the

Assignments to Mr. Fontaine were executed and Mr. Fontaine then assigned his interests to

Rosemary Hillery and the Fontaine Trust.

### B.    The "Bait" – Production Royalties and Guarantees

The wells immediately started paying out royalties to Mr. Fontaine.  P&J provided

monthly production reports outlining the total gas produced and sold by P&J from each well.

Royalty payments were typically paid two to three months after the production of the gas.  For

---

[7] "Mcf" is the gas industry abbreviation for one thousand cubic feet.

example, if production occurred during the month of May, the investors would be paid in July or August.  These production reports contained information on the amount of gas produced, less retainage, as well as the average sales price of the gas minus tax, maintenance, and royalties owed to both the landowner, or lessor, and Pam Williams for an overriding royalty (to be explained more fully *infra*).  The production reports would then set forth the profits earned by the wells' investors and P&J would issue payments accordingly.[8]

Based on these production reports, Circle J #4 Well started making payments in December of 2002 of approximately $4,000.00 per month and did so until October of 2004, when the payments steadily reduced to approximately $1,000.00 per month until they eventually stopped in June of 2005.  Circle J #5 Well started making similar payments in December of 2002 and continued in that same fashion for the next two years until June 2005.

Likewise, Circle J #1 Well started making payments in the range of $3,000.00 to $4,000.00 per month starting in March of 2003 and continued to do so until August of 2004.  At that time, much like the royalties from Circle J #4 Well, the royalties from Circle J #1 Well decreased to approximately $1,000.00 per month until they ceased in June of 2005.   Royalties from Circle J #2 Well were paid to Mr. Fontaine monthly starting in February of 2002 in the approximate range of $3,000.00 per month and purportedly continued to do so until 2005 in much the same pattern.

What Mr. Fontaine didn't know, and what the Plaintiffs would not discover until later, is that these production numbers were artificially inflated to make it appear as though the volume of gas produced from these wells, and therefore the profits paid, were higher than the wells were actually producing.  This misrepresentation was made to lure Mr. Fontaine and his family

---

[8] Ms. Woodward analyzed the volume of gas production reported by P&J through the monthly royalty and production statements, which were prepared by P&J's accounting firm, Jones Pack & Associates, CPAs. In some months, royalty payments were made, but no accompanying production statement was provided. However, Ms. Woodward calculated the volume of gas paid for in those months (as reported by the Plaintiffs) by simply dividing the net royalty payment by the applicable $/Mcf royalty ratio.

and friends (now Plaintiffs) into believing their investments were profitable such that they would

continue to make more investments with P&J.   Not surprisingly, Mr. Fontaine, having received

production reports and checks that showed that the wells in which he had invested were paying

steady royalties, and having protected his investment by a guarantee that his initial investment

would be repaid within 30 months, continued to purchase additional interests in wells with P&J

under similar arrangements.

### C.    The "Hook" – Additional (and Bigger) Investments

Shortly after Mr. Fontaine started investing, Mr. Williams began encouraging Mr.

Fontaine to involve his friends and family.  For example, on January 24, 2003, Mr. Williams

wrote Mr. Fontaine with updates on the success of the Circle J #2 Well and with an offer to

invest in a ten well program that Mr. Williams wanted to start drilling in March:

> Raymond, I have two other matters I would like to discuss with you.  First
> being the 10 well program which is scheduled to start drilling the 3rd of
> March, if you or any of your friends are still interested in participating we
> need [sic] start with the procedures.  I would like to have the funds for the
> first two wells by February 24.  This will give me time to get the same
> assignments and agreements made and back in your hands prior to drilling.
>
> As I explained to you in my last letter we would be working under the same
> agreements that we have in the past.  As a courtesy to you and your
> friends, should you invest in this project, I assure you that everyone will
> have their money back in 30 months on a well to well basis.  I am going to
> escrow half of my revenues from each well in an interest bearing account,
> which I will provide you with updates periodically.  I am very confident that
> everyone will have their money back in 24 or 25 months from this project.

While Mr. Fontaine assigned all his interests in the wells to a trust or his family members

directly, this solicitation and others led to Mr. Fontaine's friends and family investing in their own

right as well.

Mr. Fontaine's son-in-law, Robert Carlson, was one of the first of Mr. Fontaine's family to

invest.  Prior to investing with P&J, Mr. Carlson had never invested in oil and gas wells and had

no experience in the industry.  Mr. Carlson testified that his wife, Mary, had received a letter

from her father regarding his investments, the tax benefits and the high returns from his

investments, ranging from twenty-five to forty percent.  Impressed with the return Mr. Fontaine

was receiving on his investment, Mr. Carlson contacted Richard Williams on March 11, 2003, to

express his interest in investing.

On March 24, 2003, Richard Williams responded to Mr. Carlson and offered him via

letter "the same deal that I have given Ray."  Mr. Carlson testified he understood the deal to

include a fifty percent ownership interest in the well and a promise to pay him seventy-five

percent of the revenue until his initial investment was repaid, at which point he would receive

only fifty percent of the revenue.  Mr. Carlson further testified he believed that he would also

receive the benefit of the same Guarantees that his father-in-law received, including the 30

Month Guarantee.  Finally, Mr. Carlson testified that it was his understanding that the

investment money was to be used to drill new wells as opposed to buying wells that were

already drilled.

On April 1, 2003, Mr. Carlson reviewed and signed a letter agreement whereby he

agreed to advance the sum of $135,000.00 to P&J for a "fifty percent (50%) of eighty-one and

one-half percent (81.5%) working interest" in P&R Trust #3 Well (the "P&R Trust #3 Letter

Agreement").  The P&R Trust #3 Letter Agreement, much like the Circle J #4 and #5 Letter

Agreement, also provided the following:

> You shall receive seventy-five percent (75%) of the net revenue produced
> by P&R Trust #3 until you have received a total of the sum of One hundred
> thirty-five thousand dollars (135,000.00), designated as "payout."  After
> "payout" you shall receive fifty percent (50%) of the net revenue produced
> by each well.

In addition, the P&R Trust #3 Letter Agreement included both the 30 Month and the 100 Mcf

Guarantees.  Mr. Carlson testified that it was his understanding that the 100 Mcf Guarantee was

through the life of the well.  Mr. Williams disagreed and testified that the 30 Month Guarantee

and the 100 Mcf Guarantee lasted only until the initial well investment was repaid by P&J.

Mr. Carlson and Richard Williams, on behalf of P&J, signed the P&R Trust #3 Letter Agreement.  The same day, Mr. Carlson was assigned a "fifty-percent (50%) of eighty-one and one-half percent (81.5%) working interest" in P&R Trust #3 pursuant to an Assignment prepared and signed by Pamela Williams and recorded in the Magoffin County Clerk's office.  According to Mr. Carlson, the incoming royalties, P&J's relationship with a "good" company willing to purchase the gas (which he believed to be Columbia Gas), and the guarantee that he would get his money back ultimately convinced him to invest.

In addition to encouraging Mr. Fontaine's friends' and family's involvement, Mr. Williams encouraged Mr. Fontaine to make bigger investments with P&J.  On October 10, 2003, Mr. Williams wrote Mr. Fontaine with an opportunity to invest in twenty wells that would be drilled over the next four months for $1,350,000.00 (the "Twenty Well Program").  Mr. Williams, knowing that Mr. Fontaine assigned the well interests to family members or to a trust, urged Mr. Fontaine to accept the offer:

> Raymond, you know as well as I that when a man reaches a certain age our families [sic] security is top on our minds.  If you will go with me on this project not only will it add to your security, but it would secure me and my family for life.

He asked Mr. Fontaine to advise him "as soon as possible" if he had any interest and, as a result, Mr. Fontaine tendered $1,350,000.00 to P&J to purchase interests in the Twenty Well Program.[9]

As the royalties kept flowing in, Mr. Fontaine and Mr. Carlson continued to invest in wells with P&J.  In addition to P&R Trust #3, Mr. Carlson also invested in four other wells for his benefit or that of his daughter in trust.[10]  In addition to the Twenty Well Program, Mr. Fontaine

---

[9] The Twenty Well Program includes:  (1) Minix #3; (2) Bailey #1; (3) Prater #2; (4) Prater #3; (5) Bates #1; (6) Arnett #7; (7) Arnett #8; (8) Reed #1; (9) Reed #2; (10) Reed #3; (11) Reed #4; (12) Rowe #1; (13) Dunn #2; (14) Dunn #3; (15) P&R Trust #5; (16) A. Bailey #2; (17) Circle J Farm #3; (18) May #10; (19) May #11; and (20) May #12.

[10] These wells include: (1) FS Martin No. 4; (2) Puckett #1; (3) P&J No. 1; and (4) Fontaine No. 1.

purchased other wells from P&J under similar arrangements and assigned them to friends, family members or a trust.  The evidence shows that friends and family of Mr. Fontaine and Mr. Carlson, i.e. the Plaintiffs herein, invested in wells with P&J under similar arrangements although none invested on the same scale as Mr. Fontaine himself.  At the end of the day, Mr. Fontaine and/or the Plaintiffs invested in approximately 65 wells with P&J at an investment price of approximately $67,500.00 to $135,000.00 per well.

### D.    The "Sting" – The April 2005 Shut-In

Until the early part of 2005, Mr. Fontaine and the Plaintiffs who had invested were receiving steady monthly royalty payments between $1,000.00 and $5,000.00 per well based on the reported production from the wells.  In late 2004, the payments dropped substantially and then ceased in June of 2005, except for some additional minimal payments in March of 2006 and July and August of 2007.

This cessation of production was blamed on a reported shut-in of the wells on April 7, 2005 (the "2005 Shut-In").  The Plaintiffs were given varying accounts for the 2005 Shut-In.  On May 11, 2005, Plaintiff Joan Casartello received a letter from Richard Williams explaining that the wells would be shut-in due to the recent flood.  Mr. Williams explained to Ms. Casartello that "Columbia will be shut in for another 30 days due to the flood and the weather conditions."

On July 15, 2005, Mr. Carlson received a letter prepared by Jones Pack & Associates at Mr. Williams' request and addressed to "all investors" that explained the wells were "shut in by the pipeline that gas is sold to" and that no more production or disbursement would be made until further notice.  Mr. Carlson testified that it was his understanding, based on the July 15, 2005, letter, and additional communications with Mr. Fontaine and Mr. Williams, that the production was interrupted because Columbia Gas ("Columbia"), the alleged purchaser of the gas from the Plaintiffs' wells, was no longer buying gas.

14

The 2005 Shut-In continued throughout the remainder of 2005 and into 2006.  Mr. Carlson received a letter from Richard Williams dated January 30, 2006, providing yet another explanation for the shut-in:

> As you are aware, all wells have been shut in since April 7, 2005.  The reason for this is we received approximately 12" of rain in six hours which flooded Columbia Natural Resources compressor to whom we sale [sic] your gas.  After waiting until June, they advised us it would probably be October before the line was up and running.  October has come and gone and the line still isn't repaired nor is the compressor running yet.
>
> In June of 2005, as you are also aware, your father-in-law and I decided to lay our own line so we would not be caught in this situation again.  The pipeline was started in mid-June and consists of twenty-five (25) miles.  The line at present time is completely laid, compressors have been installed and we presently are fabricating from the compressor to the hot-tap in Nisource line.  We expect to be in full production by February 15, 2006 at the latest.

According to Mr. Williams, the "line" referred to in the letter was a pipeline laid by the Fontaine Williams Gas Gathering System, LLC.  It was partially funded by Mr. Fontaine and/or one of the various trusts created by Mr. Fontaine that are Plaintiffs herein.  The pipeline was completed in November of 2005 and turned on for a short period of time in December but was eventually shut down, according to Mr. Williams, "for lack of firm transportation of the gas."

At trial, Mr. Williams provided a different explanation for the 2005 Shut-In.  According to Mr. Williams, Mr. Fontaine directed him to shut-in all the wells because he wanted to construct his own pipeline to transport the gas to maximize his investment.  This is inconsistent with Mr. Williams' representation in the January 30, 2006, letter that the agreement to construct the pipeline was reached in June of 2005, two months after the April 5, 2005, shut-in, and in response to a desire to avoid being "caught in the situation again."  This same defense was also rejected by the District Court as an improper modification of the parties' contract with respect to the Guarantees.

Following the 2005 Shut-In, Mr. Fontaine continued to invest in additional wells with P&J. Between April 7, 2005, and Mr. Fontaine's death in June of 2007, Mr. Fontaine invested an additional $1 million in wells with P&J and primarily assigned most of those wells to the Fontaine Trust.  According to Mr. Carlson, no further royalties were paid following the 2005 Shut-In with the exception of partial production payments in July and August of 2007 based on reported production in April and May of 2007.  There is also evidence of nominal royalties paid following the 2005 Shut-In in March of 2006.  In all instances, the amounts were approximately $500.00 or less per payment.  No explanation was given by the Defendants as to why these months avoided the 2005 Shut-In.

> **E.    Uncovering the Truth – The Investigation**

Mr. Fontaine died in June of 2007.  Mr. Carlson, acting on behalf of the Plaintiffs, sought to meet with Richard Williams to determine the extent and scope of Mr. Fontaine's investments. Mr. Carlson arranged a meeting with Richard Williams and his accountant on October 17, 2007. At that meeting Mr. Carlson asked Richard Williams to provide him information to appraise Mr. Fontaine's holdings, loans and other agreements with P&J.

Despite Mr. Carlson's request for further information from Mr. Williams, none was forthcoming.  As a result, Mr. Carlson began his own independent investigation into Mr. Fontaine's interests in the gas wells.  Using the online databases provided by the Kentucky Geological Survey ("KGS"), Mr. Carlson investigated the wells in which the Plaintiffs purportedly owned an interest and discovered not only that the wells listed on Mr. Fontaine's well assignments, allegedly identifying his interest, did not correspond to wells as identified by the KGS, but several of the wells were ancient or the permit numbers no longer existed.

When Mr. Carlson was unable to get satisfactory answers from Mr. Williams regarding these discrepancies, Mr. Carlson and the other Plaintiffs commenced a more thorough investigation into the Plaintiffs' transactions with the Defendants through the litigation in the

District Court.  As a result, the Plaintiffs uncovered a number of misrepresentations by the

Defendants about their investment, outright concealment of information related to the wells in

which the Plaintiffs' invested, misappropriation of the Plaintiffs' money, and evidence showing a

complete disrespect by the Williams' of P&J's separate corporate status.

> **(1)    Misrepresentations about the Well Names, Permit Numbers, and Operations of the Wells**

In the fall of 2009, an engineering expert for the Plaintiffs, Richard Williams, Robert

Carlson, and Richard McCown, an inspector for the Kentucky Division of Oil and Gas (the

"Division"), as well as counsel for the parties, visited what Mr. Williams asserted were the sites

of the various wells assigned to the Plaintiffs (the "2009 Site Visit").  Not all of the wells identified

by Richard Williams were available for viewing because some leases were lost due to P&J's

failure to pay shut-in royalties (discussed more fully below) and the landowners refused entry.

During the Site Visit, Mr. McCown used a GPS device to verify information about each

well identified by Mr. Williams with the records of the Division.  Mr. Williams showed the group

approximately 65 wells in which the Plaintiffs had purportedly invested (excluding those wells to

which they were denied access).  Many of the wells that Mr. Williams identified as having been

assigned to Mr. Fontaine or one or more of the Plaintiffs had a different name and/or permit

number in the records of the Division than what Mr. Williams had represented.  The records of

the Division also identified a well operator other than P&J for some wells.[11]  Furthermore, some

of the wells did not appear in the Division's records at all.[12]  It was this investigation that fully

opened up the dam of lies built by the Defendants.

---

[11] These wells include: (1) Charles Rowe #1; (2) Morgan Rowe #1; (3) Betty Barnett #2; (4) Betty Barnett #1; (5) Martin #1; (6) K.N. Salyer #1; (7) Kash Arnett #2; (8) R.A. Wireman #1; and (9) Reed #3 Wells.

[12] Mr. Carlson testified that these wells include: (1) Arnett #8; (2) Circle J #6; (3) Circle J #7; (4) Circle J #11; (5) Circle J #12; (6) Reed #5; and (7) Reed #6 Wells.

The Plaintiffs' expert, Michael Miller, testified regarding the permitting and drilling process in Kentucky.  According to Mr. Miller, Kentucky law requires that the developer of an oil and gas well obtain a permit in advance of drilling.  Through the permit process the well is given a unique permit number.  It is registered in the Division's records and the well is subject to periodic inspection to assure compliance with conservation and environmental requirements.

Once a well has been properly located and permitted it can be drilled and "completed." The drilling consists of making a hole several inches in diameter from the surface to the target formation with the lower section of the well commonly having a somewhat smaller diameter than does the upper section.  As the well is drilled, the contents of that hole are brought to the surface.  The well is "logged" which means that a record is kept of the type of rock the drill encountered at various depths and, on many wells, sophisticated electrical, radioactive, wellbore diameter, temperature, and other measurements are also made by tools lowered into the drilled well.  The well log information is then used to satisfy the requirement of KRS §353.660 that an Affidavit of Well Log and Completion Report be filed for each drilled well, as well as to determine the depths of the well that must be "cased" with metal pipe to comply with Kentucky statutes and regulations to prevent contamination of the wells by ground water.

Mr. Miller reviewed the information collected during the 2009 Site Visit as well as photographs taken and concluded that only 30 of the 65 wells in which the Plaintiffs purportedly invested were actually drilled for the Plaintiffs.  To reach this number, Mr. Miller considered only those wells in which the names assigned by P&J matched Division records, were permitted by the Division and had some record of drilling, primarily a Well Log and Completion Report.

Mr. Miller concluded that these 30 wells which were identified were not drilled and/or completed in accordance with the best practices in the industry.  Mr. Miller surmised from the photographs provided to him that P&J utilized previously-used pipe, meters and other well-site equipment for the wells which was not connected to any pipelines to transport gas.  According

to Mr. Miller, P&J did not drill the wells in compliance with prudent commercial oilfield practices or relevant well spacing law.  In addition to the equipment, Mr. Miller also criticized P&J's failure to install casing to prevent liquids from impeding the efficient flow of gas from the producing reservoir and P&J's use of an "open-hole" completion method.  Mr. Miller opined that of the wells that could be identified, P&J did not use the Plaintiffs' investment money for its proper purpose, i.e. for properly drilling and completing the wells.

Mr. Miller found that 21 of the wells identified by Mr. Williams had a different name in the Division records.  Even more troubling, Mr. Miller found that many of these wells had a different permit number assigned to them by the Division.  The Defendants, through Mr. Williams' testimony, made no attempt to explain why the names and permit numbers assigned to the wells in the Division records differed from the Letter Agreements and Assignments.  While the Mr. Miller conceded that the use of a "farm name"[13] is a common practice, which provides some explanation for the difference in the names, it is not enough to explain the sheer number of discrepancies in the names and permit numbers revealed at trial.

Moreover, Mr. Miller concluded that on many of these wells, P&J wasn't even listed as the operator in the Division records, and even worse, some of the wells identified by Mr. Williams were not listed in the Division records at all.  The Defendants failed to satisfactorily explain why P&J does not appear as the operator or why some of the wells identified do not appear to exist at all according to the Division records.  The Defendants' only explanation for the disparities between the Division records and the representations made by the Defendants is testimony by Mr. Williams summarily blaming "driller talk," the workings of state government and P&J's own sloppy recordkeeping.  Merely pointing the finger at state

---

[13] A "farm name" is a name generally derived from the name of the surface owner at the time the gas was leased by the developer.  Typically, the first well drilled on a farm is designated #1, and subsequent wells are numbered sequentially.

government, without more, is insufficient.  Furthermore, it is clear that "driller talk" and sloppy

recordkeeping cannot explain all the discrepancies.

Most significantly, the Defendants have not credibly explained the patently false Well

Log and Completion Reports.  Mr. Miller testified that in several cases the Defendants filed the

same Well Log and Completion Report for multiple wells while representing under oath that

each was an independent log for a separate well.  The Well Log and Completion Reports[14] for

Circle J #3, #4 and #5 Wells are identical for the first 2,235 feet although their starting elevations

vary by 176 feet, which is a geologic impossibility according to Mr. Miller.  In addition, the

Rondal Reed #1 and Rondal Reed #3 Wells were reported by the Defendants with identical

geologic records for the first 1,705 feet from the surface, although their reported surface

elevations vary by 130 vertical feet, also a geologic impossibility.  The Court agrees with Mr.

Miller that this disparity calls into question the integrity of any of the Defendants' documentation

that may support a contention that the wells were actually drilled.

In addition to these misrepresentations, the Plaintiffs also discovered that they did not

receive interests in newly-drilled wells but rather in wells that had been previously drilled and

completed, sometimes *decades* earlier.  For example, on January 24, 2003, Mr. Williams wrote

to Mr. Fontaine offering him an opportunity to invest in an option of two wells that are "6 months

old and have never been produced."  Mr. Williams urged Mr. Fontaine to make a decision

quickly, as his option would expire within the week.  On January 28, 2003, Mr. Fontaine

purchased an option on the two wells referenced by Mr. Williams, the Fred Howard #1 and Kash

Arnett #2 wells, for $127,500.00 under similar terms as prior agreements and assigned the wells

to his three daughters.

---

[14] Included in the Well Log and Completion Report is a log that identifies each type of rock or stratum
encountered during the drilling of the well and the depth at which it was encountered, as well as the
surface elevation of the well.

Although Mr. Williams represented that the wells were only 6 months old and never completed, the Well Log and Completion Report filed with the Division shows that the Fred Howard #1 was drilled starting July 9, 1976 and completed on July 17, 1976. Furthermore, the Kash Arnett #2 was assigned to P&J in 1999, despite Mr. Williams' representations that the option to purchase it would expire within the week.

These misrepresentations were not isolated instances. On October 10, 2003, Mr. Williams wrote, "My Proposal to you is I want to drill all twenty (20) locations in the next four (4) months;" however, eight of the twenty wells in the Twenty Well Program were drilled prior to the date of the letter.[15] In addition, the Defendants paid Mr. Fontaine for $1,661.34 of gas reportedly produced by the Rowe #1 Well in March of 2004 despite the fact that the Rowe #1 Well was not transferred to P&J until September 15, 2005. Furthermore, the Division records indicate that the Rowe #1 Well is actually the Morgan Rowe #1 Well, which was completed on October 31, 1948 – over 50 years earlier! Finally, on January 26, 2004, Mr. Williams told Mr. Carlson that P&J had drilled the Puckett #1 Well down to 1600 feet and projected it would be fully drilled by January 28, 2004. But the Well Log and Completion Report submitted by Pamela Williams show the Puckett #1 Well was completed in September of 2003. These are just a few select examples of the Defendants' misrepresentations regarding when the wells were drilled and completed.

In response, the Defendants again failed to explain the discrepancies and defended on Mr. Williams' testimony that Mr. Fontaine was aware that he was receiving previously drilled wells, despite Mr. Williams' representations in the letters to the contrary. According to Mr. Williams, who only conducted business with Mr. Fontaine over the phone, Mr. Fontaine was not as concerned with the nature and quality of the wells in which he invested, but more concerned

---

[15] These wells include: (1) Prater #2; (2) Prater #3; (3) Bates #1; (4) Rowe #1; (5) Dunn #2; (6) Dunn #3; (7) Circle J Farm #3; and (8) May #10.

with the ability to obtain the tax benefits for "intangible drilling costs" associated with the drilling of an oil and gas well.  However, Jeff Jones, P&J's own accountant, testified that it was his understanding that all the wells were to be newly drilled because "you cannot take intangible drilling cost on a reworked well."

Although Mr. Carlson admits he was not privy to any conversations between Mr. Fontaine and Mr. Williams, the record contains several handwritten notations by Mr. Fontaine on various Letter Agreements that serve as evidence of Mr. Fontaine's interest in the production revenues of the wells.  Moreover, Mr. Williams' attempt to avoid explaining his actions by stating that Mr. Fontaine was aware that he was misrepresenting the status of the wells does not explain Mr. Carlson's understanding that he would receive interests in newly drilled wells and Mr. Williams' representations to him to the contrary.  There is simply no evidence to corroborate Mr. Williams' testimony.

### (2)    Misrepresentations and Concealment of the True Production Status of the Wells

Most significant to the claims herein are the Defendants' misrepresentations regarding the amount of gas produced and sold.  Although it was Mr. Carlson's belief that the gas was being produced and sold exclusively to Columbia, P&J actually sold the gas to BTU Gas Company, Inc. ("BTU") and Jefferson Gas, LLC ("Jefferson").  The Plaintiffs asked Ms. Woodward to analyze P&J's sales to BTU and Jefferson for the years 2003 through 2009, and in doing so, Ms. Woodward found some startling inconsistencies.

In 2003, BTU reported that it purchased 29,577 Mcf of gas from P&J.  Jefferson provided no records for that year.  Yet the Defendants reported to the Plaintiffs that their wells produced over 254,817 Mcf of gas during 2003 and paid the Plaintiffs for that amount of gas production, which is over eight times the amount of gas actually sold to BTU.  Even assuming identical sales to Jefferson in 2003 (which the Defendants neither claimed nor proved), the Defendants

22

still would have reported and paid Mr. Fontaine and the Plaintiffs four times as much gas as

they would have sold to BTU and Jefferson combined.  Similarly, in 2004, BTU reported

purchasing 32,733 Mcf of gas and Jefferson's documents show purchases of 57,886 Mcf.  But

the Defendants reported to the Plaintiffs that their wells produced over 362,775 Mcf, over four

times the amount of gas actually sold.  Ms. Woodward concluded based on her analysis of 2003

and 2004 that there is a 514% disparity between the volume of gas actually produced and sold

and the volume reported to the Plaintiffs.

Furthermore, the records from KGS, Kentucky's official archive for data on petroleum,

show that the production reported to the state was likewise inconsistent with the numbers

reported to the Plaintiffs.  KGS compiles production reports based on the Defendants' reports of

production for each of the subject wells.  The KGS records show that beginning with the very

first wells purchased by Mr. Fontaine (Circle J Farm #4 and #5 Wells), the numbers provided to

Mr. Fontaine and the numbers reported to the state vary greatly.  The same is true of Mr.

Carlson's first well (Harry Puckett #1) and the first well assigned to Mr. Fontaine's daughters

(Fred Howard #1).

When questioned about this large disparity, Mr. Williams testified that the disparity was

the result of line loss and a tithe paid by P&J to various local churches by allowing the churches

to tap into the gas lines and use the gas for free.  Ms. Woodward testified, and the Court

agrees, that the disparities are too great for this explanation to be plausible; according to Ms.

Woodward, the churches would have used over ten times more gas than all of BTU's 437

residential customers combined.  Once again, there is no corroborating evidence to support Mr.

Williams' testimony.

### (3)    Misappropriation of Mr. Fontaine and the Plaintiffs' Money

The lies didn't stop with the misrepresentations about the wells or the production

reported; the evidence shows that in many instances, the Defendants just took the Plaintiffs'

money without giving anything in return.  On March 19, 2004, Mr. Fontaine caused an

$187,500.00 payment to be made to P&J for the purchase of interests in three wells (the "Three

Well Drilling Program").  The evidence shows no interests in any wells were assigned to Mr.

Fontaine or any of the Plaintiffs in exchange for that payment.  The same is true for a payment

of $284,000.00 made on October 28, 2005, to purchase interests in two wells (the "Two Well

Drilling Program").  Based on the evidence, no interests in those wells were assigned to Mr.

Fontaine or the Plaintiffs.

Moreover, Mr. Williams solicited and received $125,000.00 from Mr. Fontaine for the

purchase of certain property in West Virginia.  The purchase of the property was to be in

connection with the construction of the Fontaine Williams Gas Gathering System, LLC pipeline.

Although the property was purchased, neither Mr. Fontaine nor any entity in which he had an

interest, received any title to or interest in that property; rather, the property was titled in the

name of P&J.  Finally, the evidence shows that Mr. Fontaine conveyed $700,000.00 to P&J as

part of the payment for that same pipeline.  Mr. Williams acknowledged at trial that the money

was not used for the construction of the pipeline and the money was kept by P&J.

### (4)   The Concealment of the Loss of the Blanket Bond and the Failure to Pay Shut-In Royalties

The Plaintiffs also discovered that the Defendants failed to inform them that in February

2007, P&J's blanket bond was revoked by the Division for failure to comply with state laws and

P&J therefore was subsequently no longer legally allowed to operate its gas wells.  More

egregious, however, was the Plaintiffs' discovery that P&J did not have the ability to operate the

wells for at least two years prior to the revocation of the blanket bond because since 2005, P&J

had failed to pay shut-in royalties for all but two wells to preserve the leases on the wells.

Many of the P&J leases required the payment of a royalty to the landowner if production

temporarily ceased from wells located on the leased premises to keep the lease in effect (the

24

"Shut-in Payment").[16]  For example, pursuant to the lease between Franklin Bailey, as lessor,

and P&J Resources, Inc., as lessee, dated June 1, 1993 (the "Bailey Lease"), if there was no

production, P&J could preserve the lease paying a Shut-in Payment of $1 per acre for each year

the wells were shut-in.  The Bailey Lease covered 100 acres of land, and the Bailey #1 Well and

the A. Bailey #2 Well were reportedly drilled on the Bailey Lease.  The evidence shows that P&J

failed to make the Shut-in Payment required by the Bailey Lease, and the Lease was therefore

terminated by the lessor.

P&J executed an Operating Agreement with Mr. Fontaine originally to operate six wells

owned by Mr. Fontaine.  Mr. Williams testified at trial that the Operating Agreement ultimately

applied to all of the wells in which the Plaintiffs owned interests.  Among P&J's obligations

pursuant to the Operating Agreement, it undertook to provide "any labor or service, including

third party services, required to maintain the wells…"  The Operating Agreement also provided

that "P&J shall not plug or abandon a well without first receiving written approval from Williams

and Fontaine…"  Mr. Williams testified that all of P&J's leases have been terminated for failure

to pay shut-in royalties, except for P&J's leases with Circle J. Farms and P&R Trust – entities

owned by the Williams.  Not surprisingly, no credible explanation was offered for the failure to

pay the Shut-In Payments.

### (5)      "Unity of Ownership and Interest" Between P&J and the Williams

Last but not least, the Plaintiffs uncovered and introduced at trial substantial evidence to

show the "unity of ownership and interest" between P&J and the Williams.  First, no corporate

records such as articles of incorporation, bylaws, resolutions, annual reports, or corporate

minutes were introduced as evidence.  The only information regarding P&J's corporate accounts

---

[16] Examples of these leases included the following: (1) the lease between Franklin Bailey, as lessor, and P&J, as lessee, dated June 1, 1993, upon which the Bailey #1 and #2 Wells are situated; (2) the lease between Rondal Reed, as lessor, and P&J, as lessee dated August 3, 2003 upon which P&J #1 Well and Reed #5 Well are situated; and (3) the lease between Rondal Reed, as lessor, and P&J, as lessee, dated February 26, 2003, upon which the Reed #1, #2, #3, and #4 Wells are situated.

was introduced through Jeff Jones, the Defendants' accountant, by the Plaintiffs.  Mr. Jones

testified it was his responsibility to attempt to reconcile P&J's corporate records.  According to

Mr. Jones, he had significant difficulty in tracing numerous undocumented transfers of funds in

and out of P&J accounts.  The items that could be traced demonstrate large transfers of P&J

funds directly to the Williams.  Pamela Williams regularly wrote checks to herself and to Richard

Williams out of P&J accounts, which were deposited into the Williams' personal bank accounts.

The expenses for these checks were carried on the corporate books as loans to

shareholders until Mr. Jones finally booked the expenses as management fees or compensation

to officers.  The management fees as reflected in the P&J tax returns and General Ledger were

substantial.  In 2005, $759,050.00 in management fees were "paid" to the Williams.  The

amount increased over the next two years; the management fees reported in 2006 totaled

$1,037,295.00 and $1,865,692.00 in 2007.  In 2008, the management fees dropped to

$287,469.00.  Neither Richard nor Pamela Williams received a salary and dividends were never

paid to Pamela Williams, as the sole shareholder of P&J.

Pamela Williams also directed the payment of numerous personal obligations to be paid

out of P&J funds, including their daughter's college tuition, donations to their church, and the

payment for cattle that was purchased for their personal farm, Circle J Farms.  During 2006 and

2007, P&J expended more than $1.3 million on "farm expenses" related to Circle J Farms, a

farm owned by the Williams.  Mr. Jones acknowledged that he could not trace many of the

transfers among the P&J accounts and those of the Williams.

Pamela Williams personally guaranteed corporate debts of P&J.  In 2005 alone, Pamela

Williams personally guaranteed three lines of credit given to P&J by First Commonwealth Bank.

At least $90,000.00 of this credit was used to purchase cattle.  In addition, Richard Williams

personally guaranteed corporate debts of P&J.  In 2004, P&J issued a promissory note in the

amount of $300,000.00 to Mr. Fontaine.  The promissory note was signed by Pamela Williams,

as president of P&J, and by Richard Williams, "personally."  P&J also pledged as additional

security five well assignments to guarantee payment of the $300,000.00 loan.

## Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. §1334.  This is a core proceeding

pursuant to 28 U.S.C. §157(b)(2)(B), (I), and (J).  Venue is proper pursuant to 28 U.S.C. §1409.

## Analysis

### A.    Motion for Default Judgment Against P&J

Prior to trial, the Plaintiffs moved for a default judgment against P&J for P&J's failure to

answer or otherwise respond to the Complaint on all counts.  The Court reserved ruling on the

Motion until the conclusion of trial.

When a party fails to plead or otherwise defend, then the clerk must enter the party's

default.  Fed. R. Civ. P. 55 (incorporated by reference in Fed. R. Bankr. P. 7055).  Upon entry of

default, the Court may enter a default judgment.  *Id.*  In considering whether to enter a default

judgment, the court balances several factors, including (1) possible prejudice to the plaintiff; (2)

the merits of the claims; (3) the sufficiency of the complaint; (4) the amount of money at stake;

(5) possible disputed material facts; and (6) whether the default was due to excusable neglect.

*Russell v. City of Farmington Hill*, 34 Fed. Appx. 196, 198 (6th Cir. 2002).  A court may conduct

hearings to determine whether to enter a default judgment to (1) conduct an accounting; (2)

determine the amount of damages; (3) establish the truth of any allegation by evidence; or (4)

investigate any other matter.  Fed. R. Civ. P. 55(b)(2)

Based on the balancing of these factors, the Court declines to enter a default judgment

against P&J.  The money at stake in this litigation is substantial.  The Plaintiffs' allegations are

based not only on breach of contract, but intentional acts of fraud and conversion.  Even taking

the allegations in the Adversary Complaints as true for purposes of the motion for a default

judgment against P&J, there are insufficient factual allegations in the Complaints for this Court

27

to infer the intent of P&J's agents, the Williams, without additional evidence at trial that allows this Court to weigh the credibility of the testimony and the evidence. Therefore, the Court shall overrule the Motion for Default Judgment against P&J and enter its findings of fact and conclusions of law based on the evidence presented at trial in support of the Plaintiffs' claims, as set forth more fully below.

**B.      Fraud**

The primary allegation by the Plaintiffs is that the Defendants engaged in a fraudulent, "Ponzi-like" scheme to induce the Plaintiffs to invest large sums of money in non-existent or worthless well interests. In Kentucky, a party claiming fraud in the inducement must establish six elements by clear and convincing evidence: (a) material representation; (b) which is false; (c) known to be false or made recklessly; (d) made with inducement to be acted upon; (e) acted in reliance thereon; and (f) causing injury. *See United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999); *Anderson v. Wade*, 33 Fed. Appx. 750, 756 (6th Cir. 2002). Proof of fraud "may be developed by the character of the testimony, the coherency of the entire case as well as the documents, circumstances, and facts presented." *Rickert*, 996 S.W.2d at 468. Fraud may also be established by evidence that is wholly circumstantial. *Id.*

Kentucky courts have recognized that "[p]arties contemplating the commission of fraud do not usually blow a horn or beat a drum to call attention to what they are doing." *Bolling v. Ford*, 281 S.W. 178, 179 (Ky. 1926). For this reason, fraud may be inferred from the facts and circumstances. *Id. at* 180. Looking at the evidence as a whole, it is clear that the Defendants concocted a fraudulent scheme whereby they intentionally led Mr. Fontaine and the Plaintiffs to believe that they were purchasing interests in viable and profitable gas wells operated by P&J to induce Mr. Fontaine and the Plaintiffs to invest millions of dollars in worthless and/or non-existent gas wells.

28

Almost immediately from the time that Mr. Fontaine started investing in wells with P&J, P&J paid Mr. Fontaine a steady stream of monthly royalty payments in the thousands of dollars based on false monthly production reports that showed the wells producing at an artificially high rate. These numbers quite simply made the investments look like good investments with the potential to yield solid, if not high, returns. This misrepresented production, combined with the payment of inflated royalties and the 30 Month and 100 Mcf Guarantees on subsequent investments, were clearly intended to and did induce Mr. Fontaine's and the Plaintiffs' investments in the Debtors' scheme.

It was during 2003 and 2004 that the Plaintiffs and Mr. Fontaine "invested" in the majority of the wells they ultimately purchased. During those same years, the Defendants reported on the monthly production reports at least four times the amount of gas actually produced and paid Mr. Fontaine and the Plaintiffs royalties based on that inflated production. By 2005, Mr. Fontaine and the Plaintiffs were investing less money with P&J. Not surprisingly, a comparison of the monthly production reports shows that the reported gas production from the wells decreased in tandem in the latter part of 2004. The returns from the investments decreased and slowly trickled from these investments until 2005, when the wells "dried up," or, in other words, were "shut-in." Despite the "drought," the management fees paid to the Williams by P&J steadily increased to over $1 million dollars in 2006 and approximately $1.8 million in 2007.

At the end of the day, the Defendants misrepresented to Mr. Fontaine and the Plaintiffs (1) the amount of gas produced and sold; (2) the identity and existence of the wells in which Mr. Fontaine and the Plaintiffs' invested; (3) P&J's ability to operate the wells; and (4) when the wells were actually drilled and completed. In addition to making material false representations, the Defendants also concealed the amount of gas actually produced and the true royalties from the Plaintiffs, as well as offered only half-truths as to the actual identity of

the wells.  These false representations and the concealment of these facts are tantamount to

material misrepresentations.  *See Faulkner Drilling Co., Inc. v. Gross,* 943 S.W.2d 634, 638

(Ky. App. 1997) ("When one party to a contract knows that the other relies on him to disclose

all facts material to the executor thereof, the duty rests on him not to conceal anything

material to the bargain, and one causing damage by concealment must assume the entire

responsibility.")

It does not matter that these material misrepresentations were primarily made to Mr.

Fontaine.  Under Kentucky law, the representation need not be made directly to the claimant

so long as the perpetrator knew or should have known that the claimant would receive the

misrepresentation.  When a misrepresentation is intended to induce action by the public or

by a specific class of people, the victim of such inducement is entitled to recover for the

misrepresentation.  *Graham v. John R. Watts & Son,* 36 S.W.2d 859, 861 (Ky. 1931).  The

evidence shows Mr. Williams not only knew Mr. Fontaine was assigning his interests to

various members of his family, but Williams solicited well investments from Mr. Fontaine's

friends and family.

Furthermore, Mr. Fontaine and the Plaintiffs detrimentally relied on the Defendants'

materially false representations.  In Kentucky, a claimant may establish detrimental reliance

when he acts or fails to act due to fraudulent misrepresentations.  *See Rickert*, 995 S.W.2d at

469.  Mr. Fontaine and the Plaintiffs purchased interests in these wells because the Defendants

represented in the production reports and royalty payments that the wells were producing

substantial royalties when in fact they were not.

Notwithstanding Mr. Fontaine and the Plaintiffs' reliance on the information provided to

them by the Defendants in deciding whether to invest, the Plaintiffs' cannot prevail if an ordinary

inspection or investigation would have uncovered the fraud.  *Yeager v. McLellan*, 177 S.W.3d

807, 811 (Ky. 2005); *see also Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V.*, Nos.

2008-CA-002389-MR and 2009-CA-000026-MR, 2010 WL 2696278, *11 (Ky. App. July 9, 2010). The Defendants lied in P&J's records and filings with the state. Because of these lies, it took years of litigation, and expert forensic accounting, to uncover the extent of the Defendants' fraud. The Plaintiffs could not have uncovered the fraud by ordinary investigation.

The Defendants have completely failed to adequately explain these misrepresentations or the concealment of these facts. Richard Williams was the only witness offered by the Defendants to explain these discrepancies and his testimony is not credible. The Defendants have produced no documentation or other proof beyond Mr. Williams' own testimony, and Mr. Williams, much like the last time he testified before this Court, cannot keep his stories straight. Mr. Williams was impeached multiple times at trial by documents and his own prior testimony. His testimony often shifted from a clear understanding of the issue and the question posed to him to obvious evasiveness. His explanations for the discrepancies, when offered, were implausible. Furthermore, his testimony is self-serving, particularly as to his testimony regarding what Mr. Fontaine knew about the wells and what Mr. Fontaine directed him to do.[17]

The Plaintiffs have proven by clear and convincing evidence that the Defendants have committed fraud in the inducement.

**C.      Conversion**

The Plaintiffs also allege that the Defendants converted Plaintiffs' funds. In the alternative, they argue that the Defendants have retained Plaintiffs' funds and other property which the Plaintiffs are entitled to recover under the doctrine of unjust enrichment under an

---

[17] Both the Plaintiffs and Defendants objected to the admissibility of statements by Mr. Fontaine at trial as hearsay. The Court ordered post-trial briefing on the issue. After considering the parties' briefs and arguments, the Court overrules the parties' objections; however, the Court's ruling on the Plaintiffs' objections to Mr. Williams' attempt to offer statements by Mr. Fontaine is insignificant because of the weight the Court gives Mr. Williams' testimony as discussed herein.

implied contract.  The Court finds that the Defendants have converted funds of the Plaintiffs for their own use.

Conversion is a tort involving the "wrongful exercise of dominion and control over property of another."  *State Auto Mut. Ins. Co. v. Chrysler Credit Corp.*, 792 S.W.2d 626, 627 (Ky. App. 1990).  The elements necessary to establish the tort of conversion are: (1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendants' own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property.  *Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n. 12 (Ky. 2005) (*quoting* 90 C.J.S. TROVER AND CONVERSION §4 (2004)).  Conversion has also been defined in more succinct terms as "'the deceitful, intentional appropriation of the money without the right or without belief of right[.]'"  *See Baer v. Fifth Third Bancorp*, No. 2009-CA-001314-MR, 2011 WL 4407453, *2 (Ky. App. Sept. 23, 2011) (*citing Brundage v. Commonwealth of Kentucky*, 416 S.W.2d 728 (Ky. 1987)).

The Plaintiffs have set forth uncontroverted evidence that the Defendants misappropriated Mr. Fontaine's money.  Mr. Fontaine invested $187,500.00 in a Three Well Program and $284,000.00 in a Two Well Program and received nothing in return.  Mr. Williams received $125,000.00 from Mr. Fontaine for the purchase of property for the Fontaine Williams Gas Gathering System, LLC, but neither Mr. Fontaine nor the Plaintiffs received title or interest in the property.  Moreover, Mr. Williams acknowledged that P&J kept $700,000.00 of Mr. Fontaine's money for its own use rather than apply it towards its intended use.  The Defendants

32

deceitfully and intentionally converted Mr. Fontaine and the Plaintiffs' money and the Plaintiffs are entitled to recover damages from the Defendants for their acts of conversion.

**D.     Breach of Contract**

  **(1)     30 Month and 100 Mcf Guarantees**

  The District Court ruled that the Defendants breached the 30 Month and 100 Mcf Guarantees contained in certain Letter Agreements with the Plaintiffs.  This Court shall give preclusive effect to the District Court's ruling on this issue.  *See Kentucky Bar Ass'n v. Schilling*, 361 S.W.3d 304, 311 (Ky. 2012) (finding collateral estoppel where the issues in the second case are the same as the first, were actually litigated, actually decided, and necessary to the court's judgment).  Thus, the only remaining issues related to this claim are damages and piercing P&J's corporate veil, which are addressed below.

  **(2)     Failure to Pay Shut-In Fees**

  The Plaintiffs have also asked the Court to hold the Defendants liable for breach of contract for wells without the aforementioned Guarantees.  Specifically, the Plaintiffs argue P&J's failure to pay the shut-in fees has resulted in the loss of the Plaintiffs' interests in the remaining wells except for the two owned by the Williams and is therefore a breach of the Operating Agreement.

  Among P&J's obligations pursuant to the Operating Agreement, it undertook to provide "any labor or service, including third party services, required to maintain the wells…"  The Operating Agreement also provided that "P&J shall not plug or abandon a well without first receiving written approval from Williams and Fontaine.."  By failing to pay the shut-in fees, P&J violated these provisions of the Operating Agreement and thus breached the agreement.  The Plaintiffs are therefore entitled to damages, as discussed below.

33

E.       **Damages**

Having found that the Defendants have committed fraud, conversion and breach of

contract, the Court must now award appropriate damages to the Plaintiffs.  The Plaintiffs do not

separate their damages based on the relevant causes of action, but seek the same damages

regardless of the theory under which they seek recovery.

When an individual is induced to enter into a contract in reliance upon false

representations, the person may maintain an action for a rescission of the contract, or may

affirm the contract and maintain an action for damages suffered on account of the fraud and

deceit.  *See RadioShack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 261 (Ky. App. 2007).

Similarly, a party proving breach of contract is entitled to elect to either rescind and recover the

value of any performance rendered, or stand by the contract and recover damages sustained by

its breach as if the breaching party had performed.  *Columbian Fuel Corp. v. Skidmore*, 214

S.W.2d 761, 765 (Ky. 1948).  Finally, the proper measure of damages for the tort of conversion

is the value of the property at the time of the conversion.  *See State Auto Mut. Ins. Co.*, 792

S.W.2d at 627.

Ms. Woodward, the Plaintiffs' damages expert, testified that as a result of the

Defendants' conduct, the Plaintiffs are damaged in the total amount of $10,844,938.40, inclusive

of prejudgment interest on damages calculated at a rate of 4.75% through November 31, 2009.

Ms. Woodward's conclusions regarding the wells are based on three separate calculations:

> (1)   For wells with 100 Mcf and/or 30 Month Guarantees, the damages
> were measured by the amounts that should have been paid by P&J if the
> Guarantees had not been breached, plus interest.  Ms. Woodward testified
> that these damages are based on her understanding that the 100 Mcf
> Guarantee extended beyond repayment of the initial investment and that it
> would continue until the well was dry, although she arbitrarily ceased her
> calculations at November 31, 2009.[18]

---

[18] If a well agreement contained both a 30 Month Guarantee and a 100 Mcf Guarantee, Ms. Woodward
calculated the shortfall in accordance with the 100 Mcf Guarantee, and then analyzed the 30 Month
Guarantee.  As a practical matter, for a well with both a 30 Month Guarantee and a 100 Mcf Guarantee, a

(2)   For wells which did not have these Guarantees and do not exist for the benefit of the Plaintiffs (in that the well was not drilled or assigned to the Plaintiff per Mr. Miller's conclusions), then Ms. Woodward calculated the damages as the amount invested, less payments received, plus interest.

(3)   Finally, Ms. Woodward testified that wells which did not have Guarantees but the well was believed to exist and P&J's interest was properly assigned to the appropriate investor, the damages were valued at $0 on the assumption that the Plaintiffs received the real property interest promised in exchange for the investment.

Ms. Woodward also testified that Plaintiffs were entitled to damages (1) in the amount of $145,131.96 for P&J's failure to purchase the West Virginia property with the $125,000.00 provided to it by Mr. Fontaine and (2) in the amount of $504,860.40 for P&J's breach of the June 14, 2004 promissory note in which it borrowed $300,000.00[19] from Mr. Fontaine and failed to make any payments.   Both of these calculations include prejudgment interest.

Although Ms. Woodward did not calculate damages for the $700,000.00 given to Mr. Williams as payment for the construction of the Fontaine Williams Gas Gathering System, LLC, the Plaintiffs request a judgment for that converted amount, plus interest, pursuant to the same methodology as used by Ms. Woodward to determine the damages for the Defendants' other acts of conversion.

The Defendants have introduced no evidence to dispute the methodology or the amounts offered by Ms. Woodward other than an argument that the 100 Mcf Guarantee is not, as Ms. Woodward interpreted, to extend for the life of the well *ad infinitum* but only until payout. Specifically, the Defendants argue that the Plaintiffs' interpretation is illogical and the only logical interpretation is that the 100 Mcf Guarantee applied only until the investor received his or her initial investment in return.   This Court agrees.   There is simply no evidence regarding the

---

calculation based on a 30 Month Guarantee is redundant because if the 100 Mcf Guarantee had not been breached, it would have resulted in a repayment of the initial investment prior to the thirtieth month.

[19] The Defendants' liability on this Note was determined by the District Court on summary judgment.

duration/life of the wells and the November date appears driven by the District Court litigation schedule.

The Court finds that there is insufficient proof by the Plaintiffs to support Ms. Woodward's interpretation of the 100 Mcf Guarantee and the Court shall not award damages based on the 100 Mcf Guarantee. However, because all the Letter Agreements for wells with a 100 Mcf Guarantee also include the 30 Month Guarantee, the Court shall award damages for wells based on payments that should have been made based on the 30 Month Guarantee less any royalties paid.

Furthermore, the Court shall award prejudgment interest pursuant to Kentucky law at the reasonable interest rate set forth by Ms. Woodward, or 4.75%   Whether the Plaintiffs are entitled to prejudgment interest is a matter of state law as their recovery depends on state law causes of action. *See Payne v. Brace (In re Brace)*, 131 B.R. 612, 614 (Bankr. W.D. Mich. 1991). In Kentucky, when damages are "liquidated" then prejudgment interest follows as a matter of course but when damages are unliquidated, then the issue is a matter within the discretion of the trial court or jury. *Nucor Corp. v. General Electric Co.*, 812 S.W.2d 136, 141 (Ky. 1991). Regardless of the characterization of these damages as liquidated or unliquidated, the Plaintiffs are entitled to prejudgment interest (1) on wells with the 30 Month Guarantee, from the date that the 30 Month Guarantee was due until the date of entry of this judgment and (2) on wells without Guarantees, from the date of the filing of the District Court Complaint until the date of entry of this judgment. Moreover, the Plaintiffs are entitled to prejudgment interest on the $125,000.00 provided for the West Virginia Property from the date of the filing of the District Court Company until the date of entry of this judgment and on the $300,000.00 promissory note as of the date the balance was due, or December 14, 2004, until the date of entry of this judgment.

Based on the foregoing, the Court finds that the Plaintiffs are entitled to damages in the

total amount of $5,662,662.25, plus prejudgment interest as set forth above, as follows:[20]

*Raymond E. Fontaine Trust*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|------|--------------------|--------------------|----------------|---------|
| A. Bailey #2 | No guarantees, not verified | $67,500,00 | $24,614.75 | $42,885.25 |
| Arnett #8 | No guarantees, not verified | $67,500.00 | $33,273.71 | $34,226.29 |
| Bailey #1 | No guarantees, not verified | $67,500.00 | $28,160.76 | $39,339.24 |
| Circle J. Farm #2 | 100 Month and 30 Month Guarantee (payout due December 10, 2005) | $135,000.00 | $76,237.78 | $58,762.22 |
| Dunn et al. #2 | No guarantees,  not verified | $67,500.00 | $13,877.71 | $53,622.29 |
| Dunn et al. #3 | No guarantees, not verified | $67,500.00 | $13,840.73 | $53,659.27 |
| Fontaine #1 | No guarantees, not verified | $200,000.00 | $0 | $200,000.00 |
| Frazier #11 | No guarantees, not verified | $350,000.00 | $0 | $350,000.00 |
| Frazier #12 | No guarantees, not verified | $350,000.00 | $0 | $350,000.00 |
| J.W. Howard #3 | 30 Month Guarantee (payout due May 10, 2007) | $67,500.00 | $14,588.18 | $52,911.82 |
| Johnson #1 | No guarantees, not verified | $400,000.00 | $0 | $400,000.00 |
| KN Salyer #4 | No guarantees, not verified | $140,000.00 | $0 | $140,000.00 |
| KN Salyer #5 | No guarantees, not verified | $140,000.00 | $0 | $140,000.00 |
| Minix #1 | 100 Mcf and 30 Month Guarantees (payout due April 10, 2006) | $135,000.00 | $71,102.24 | $63,897.76 |
| Minix #2 | 100 Mcf and 30 Month Guarantees (payout due May 10, 2006) | $135,000.00 | $67,667.78 | $67,332.22 |
| Minix #3 | No guarantees, not verified | $67,500.00 | $30,095.47 | $37,404.53 |
| P&J Well #1 | No guarantees, not verified | $150,000.00 | $0 | $150,000.00 |

---

[20] The Court did not calculate prejudgment interest, and the amount of prejudgment interest is therefore not included within the total damages due set forth in the tables herein.

| P&R Trust #4 | 100 Mcf and 30 Month Guarantees (payout due March 10, 2006) | $135,000.00 | $74,319.44 | $60,680.56 |
|---|---|---|---|---|
| P&R Trust #5 | No guarantees, not verified | $67,500.00 | $28,708.27 | $38,791.73 |
| Rowe #1 | No guarantees, not verified | $67,500.00 | $25,442.50 | $42,057.50 |
| Three Well Program | 30 Month Guarantee (payout due February 16, 2007) | $187,500.00 | $0 | $187,500.00 |
| Two Well Program | No guarantees, not verified | $284,000.00 | $0 | $284,000.00 |
| **Total Well Damages:** | | | | **$2,847,070.68** |
| $300,000 Promissory Note: | Balance due December 14, 2004 | | | $300,000.00 |
| West Virginia Property | Return of investment | | | $125,000.00 |
| **Total Damages** | | | | **$3,272,070.68** |

*Rosemary Hillery*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|---|---|---|---|---|
| Circle J Farm #1 | 100 Mcf and 30 Month Guarantees (payout due November 10, 2005) | $135,000.00 | $80,313.38 | $54,686.62 |
| **Total Damages** | | | | **$54,686.62** |

*R.E. and M.F. Fontaine Family Foundation, Inc.*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|---|---|---|---|---|
| P&R Trust #8 | 30 Month Guarantee (payout due December 10, 2007) | $67,500.00 | $3,333.33 | $64,166.67 |
| P&R Trust #9 | 30 Month Guarantee (payout due December 10, 2007) | $67,500.00 | $2,224.89 | $65,275.11 |
| **Total Damages** | | | | **$129,441.78** |

*Dylan Klempner*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|---|---|---|---|---|
| Circle J Farm #7 | 30 Month Guarantee (payout due June 10, 2007) | $67,500.00 | $9,369.01 | $58,130.99 |
| FS Martin #3 | 100 Mcf and 30 Month Guarantees (payout due June 10, 2006) | $135,000.00 | $52,391.98 | $82,608.02 |

| P&R Trust #2 | 100 Mcf and 30 Month Guarantees (payout due March 10, 2006) | $135,000.00 | $74,116.17 | $60,883.83 |
|---|---|---|---|---|
| **Total Damages** | | | | **$201,622.84** |

*Gary Webster*

| **Well** | **Damage Methodology** | **Initial Investment** | **Royalties Paid** | **Damages** |
|---|---|---|---|---|
| FS Martin #2 | 100 Mcf and 30 Month Guarantees (payout due June 10, 2006) | $135,000.00 | $54,542.13 | $80,457.87 |
| **Total Damages** | | | | **$80,457.87** |

*Fontaine Children (Jean Webster, Patricia Fontaine, Mary Fontaine Carlson)*

| **Well** | **Damage Methodology** | **Initial Investment** | **Royalties Paid** | **Damages** |
|---|---|---|---|---|
| Kash Arnett #2 | 100 Mcf and 30 Month Guarantees (payout due March 10, 2006) | $127,500.00 | $69,374.04 | $58,125.96 |
| Fred Howard #1 | 100 Mcf and 30 Month Guarantees (payout due January 10, 2006) | $127,500.00 | $61,144.35 | $66,355.65 |
| Martin #1 | No guarantees, not verified | $62,500.00 | $9,048.39 | $53,451.61 |
| Martin #5 | No guarantees, not verified | $62,500.00 | $9,321.75 | $53,178.25 |
| RC May #10 | No guarantees, not verified | $67,500.00 | $29,792.39 | $37,707.61 |
| P&R Trust #1 | 100 Mcf and 30 Month Guarantees (payout due March 10, 2006) | $135,000.00 | $74,217.93 | $60,782.07 |
| **Total Damages** | | | | **$329,601.15** |
| | *Damages by individual Plaintiff* | | | |
| | *Jean Webster* | | | *$109,867.05* |
| | *Patricia Fontaine* | | | *$109,867.05* |
| | *Mary Fontaine Carlson* | | | *$109,867.05* |

*MPJ Fontaine Trust*

| **Well** | **Damage Methodology** | **Initial Investment** | **Royalties Paid** | **Damages** |
|---|---|---|---|---|
| Clay Prater #1 | 100 Mcf and 30 Month Guarantee (payout due June 10, 2006) | $135,000.00 | $50,882.19 | $84,117.81 |
| **Total Damages** | | | | **$84,117.81** |

39

*Nora Carlson Irrevocable Trust*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|---|---|---|---|---|
| FS Martin #4 | 100 Mcf and 30 Month Guarantee (payout due July 19, 2006) | $135,000.00 | $47,677.20 | $87,322.80 |
| **Total Damages** | | | | **$87,322.80** |

*Robert and Mary Carlson*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|---|---|---|---|---|
| Harry Puckett #1[21] | 100 Mcf and 30 Month Guarantees (payout due December 10, 2006) | $67,500.00 | $7,752.64[22] | $59,523.36 |
| **Total Damages** | | | | **$59,523.36** |

*Robert Carlson*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|---|---|---|---|---|
| P&J Well #1 | No guarantees, not verified | $100,000.00 | $0 | $100,000 |
| Fontaine #1 | No guarantees, not verified | $100,000.00 | $0 | $100,000 |
| **Total Damages** | | | | **$200,000** |

*Raymond Street Group, LLC*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|---|---|---|---|---|
| P&R Trust #3 | 100 Mcf and 30 Month Guarantees (payout due March 10, 2006) | $135,000.00 | $77,737.88 | $57,262.12 |
| **Total Damages** | | | | **$57,262.12** |

---

[21] The investment in and ownership of Harry Puckett #1 was shared equally by Robert and Mary Carlson and Cherry Driveway, LLC. For the tax year ended December 31, 2005, P&J paid Kentucky nonresident income tax withholding for Mr. and Mrs. Carlson. This tax was not required for LLCs, such as Cherry Driveway, LLC. The Carlsons' damage amount has been decreased by $224.00, the amount of the tax remitted on their behalf.

[22] Because the investment in and ownership of Harry Puckett #1 was shared equally between the Carlsons and Cherry Driveway, Inc., the royalties paid on the Harry Puckett #1 have been divided between these Plaintiffs accordingly.

*Cherry Driveway, LLC*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|------|--------------------|--------------------|-----------------|---------|
| Harry Puckett #1 | 100 Mcf and 30 Month Guarantees (payout due December 10, 2006) | $67,500.00 | $7,752.64 | $59,747.36 |
| **Total Damages** | | | | **$59,747.36** |

*Piaker Family Irrevocable Trust*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|------|--------------------|--------------------|-----------------|---------|
| Circle J. Farm #6 | 30 Month Guarantee (payout due May 10, 2007) | $67,500.00 | $20,959.74 | $46,540.26 |
| **Total Damages** | | | | **$46,540.26** |

*Arlene Everett*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|------|--------------------|--------------------|-----------------|---------|
| Arnett #10 | 30 Month Guarantee (payout due May 10, 2007) | $67,500.00 | $22,349.49 | $45,150.51 |
| **Total Damages** | | | | **$45,150.51** |

*Joan Casartello*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|------|--------------------|--------------------|-----------------|---------|
| Circle J Farms #11 | 30 Month Guarantee (payout due October 10, 2007) | $67,500.00 | $6,065.30 | $61,434.70 |
| Circle J Farms #12 | 30 Month Guarantee (payout due November 10, 2007) | $67,500.00 | $4,505.91 | $62,994.09 |
| **Total Damages** | | | | **$124,428.79** |

*Patricia Carucci Schwartz*

| Well | Damage Methodology | Initial Investment | Royalties Paid | Damages |
|------|--------------------|--------------------|-----------------|---------|
| KN Salyer #2 | 30 Month Guarantee (payout due December 10, 2007) | $67,500.00 | $2,575.43 | $64,924.57 |
| KN Salyer #3 | 30 Month Guarantee (payout due January 10, 2008) | $67,500.00 | $1,736.27 | $65,763.73 |
| **Total Damages** | | | | **$130,688.30** |

*Plaintiffs*

| Payment | Damage Methodology | Damages |
|---|---|---|
| $700,000.00 | Return of investment | $700,000.00 |

Finally, the Plaintiffs seek to recover punitive damages for the Defendants' fraud. Punitive damages are awarded as a general deterrence against the tortfeasor to prevent such wrongdoing from occurring again.  K.R.S. §411.184(1)(f) (" 'Punitive damages' includes exemplary damages and means damages, other than compensatory and nominal damages, awarded against a person to punish and to discourage him and others from similar conduct in the future.").  Though the statute and the case law are clear that punitive damages are not recoverable for breach of contract, *see Federal Kemper Ins. Co. v. Hornback*, Ky., 711 S.W.2d 844, 845 (Ky. 1986), *overruled in part by Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176 (Ky. 1989), it has been held that if the breach included separately tortious conduct, punitive damages may be awarded. *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993); *Ford Motor Co. v. Mayes*, 575 S.W.2d 480, 486 (Ky. App. 1978).

Punitive damages are only recoverable in Kentucky if there is clear and convincing evidence that the Defendants acted with oppression, fraud, or malice.  *See* K.R.S. §411.184 (2012).  Whether punitive damages are appropriate is within the discretion of the fact finder. *Neely v. Strong*, 217 S.W. 898, 901 (Ky. 1920).

Because the Court has found that the Defendants have committed fraud, there is sufficient evidence to support an award of punitive damages.  But it is within this Court's discretion to award such damages and the Court declines to do so. The Plaintiffs are entitled to millions of dollars in compensatory damages and the Defendants are bankrupt Debtors.  The Court does not find that an award of punitive damages will serve any useful purpose of deterrence under these circumstances.

**F.      Personal Liability and Piercing the Corporate Veil**

The Court must determine whether the Williams should be held personally liable for the

damages that have resulted from their own tortious acts and for P&J's breach of contract.

Pursuant to Kentucky law, "unless otherwise provided in the articles of incorporation, a

shareholder of a corporation shall not be personally liable for the acts or debts of the corporation

except that he may become personally liable by reason of his own acts or conduct."   K.R.S.

§271B.6-220(2) (2012).  That said, "an officer who personally participates in a tort is personally

liable to the victim, even though the corporation might also be liable under *respondeat superior*."

*Smith v. Isaacs*, 777 S.W.2d 912, 915 (Ky. 1989) (*citing* Henn & Alexander, LAWS OF

CORPORATIONS, Officer's Liabilities §230 (3d Ed. 1983)); *see also Brewer Machine & Conveyor*

*Mfg Co., Inc. v. Old National Bank*, 248 F.R.D. 478, 482 (W.D. Ky. 2008) (finding an agent may

be held personally liable in tort where the agent commits fraud which induces the other party to

enter into a contract with the principal); *Small v. Bailey*, 356 S.W.2d 756, 757 (Ky. 1962)

(holding shareholders/officers can be held individually liable for conversion of personal property

by him for the benefit of the corporation).

The Plaintiffs argue that the Williams are liable to the Plaintiffs for any tort committed by

them regardless of their association with P&J.  This Court has found that Richard and Pamela

Williams committed fraud with the intent to induce the Plaintiffs in investing in worthless and

non-existent gas wells and converted funds provided to them by Mr. Fontaine.  Richard and

Pamela Williams are liable for their own acts of fraud and conversion and are personally liable

for the damages awarded related thereto.

Although the Williams are personally liable for the torts of fraud and conversion, the

Williams are not liable for any breach of contract by P&J unless this Court finds that the

corporate veil should be pierced.  It is a long-standing rule of law that "an officer, director or

shareholder, when acting as an agent of the corporation, is also protected from personal liability

43

for making a contract where acting within his authority to bind the principal." *Smith*, 777 S.W.2d

at 913 (citing the RESTATEMENT (SECOND) OF AGENCY, §328 (1958)); *see also Smith v. Heath &*

*Co.*, 580 S.W.2d 505 (Ky. App. 1979) ("It is fundamental that an officer of a corporation will not

be individually bound when he contracts within the scope of his authority as an agent for the

corporation.").  In general, a corporation is treated as a legal entity separate and apart from its

shareholders.  However, when the corporation is used to justify wrong, protect fraud or defend

crime, the law regards the corporation as an association of persons.  *Dare To Be Great, Inc. v.*

*Commonwealth, ex. rel. Hancock*, 511 S.W.2d 224, 227 (Ky. 1974).

Three basic theories have been used to pierce the corporate veil: (1) the instrumentality

theory; (2) the alter ego theory; and (3) the equity formulation.  "Under the instrumentality theory

three elements must be established to warrant a piercing of the corporate veil: (1) that the

corporation was a mere instrumentality of the shareholder; (2) that the shareholder exercised

control over the corporation in such a way as to defraud or to harm the plaintiff; and (3) that a

refusal to disregard the corporate entity would subject the plaintiff to unjust loss." *White v.*

*Winchester Land Development Corp.*, 584 S.W.2d 56, 61 (Ky. App. 1979).  To pierce the

corporate veil pursuant to the alter ego theory, the Plaintiffs must show "(1) that the corporation

is not only influenced by the owners, but also that there is such unity of ownership and interest

that their separateness has ceased and (2) that the facts are such that an adherence to the

normal attributes, *Viz*, treatment as a separate entity, of separate corporate existence would

sanction a fraud or promote injustice." *Id. at* 61-62.  Finally, pursuant to the equity formulation

theory, "the corporate veil should only be pierced 'reluctantly and cautiously' and then only in the

presence of a combination of the following factors: (1) undercapitalization; (2) a failure to

observe the formalities of corporate existence; (3) nonpayment or overpayment of dividends; (4)

a siphoning off of funds by the dominant shareholder(s); and (5) the majority shareholders

having guaranteed corporate liabilities in their individual capacities." *Id. at* 62.  No single factor

listed as part of the equity formulation is dispositive.  *Id.*

Each of these theories essentially requires proof of two crucial elements: (1) an abuse of

the corporate form; and (2) a wrong committed against the Plaintiff.  *See, e.g., Bear, Inc. v.*

*Smith*, 303 S.W.3d 137, 148 (Ky. App. 2010); *Dwire v. Rose*, No. 2007-CA-001364-MR, 2008

WL 2551301, *4 (Ky. App. June 27, 2008).  Furthermore, regardless of whether one looks at the

equity, alter ego or instrumentality theory, the mandated factors of the equity formulation "are

considered in all the cases no matter what 'test' is being applied."  *White*, 584 S.W.2d at 62.

The Plaintiffs argue that the corporate veil should be pierced because they proved that

P&J is nothing but an alter ego of the Williams and piercing the corporate veil is necessary to

prevent the Williams from perpetuating a fraud and other illegal acts in the name of P&J and

then avoiding responsibility by hiding behind the corporate shield.  This Court agrees.

The evidence clearly demonstrates that the bulk of the five factors above have been met

and P&J is nothing more than the alter ego of the Williams.  First, KRS §271B.16-010 requires

all Kentucky corporations to maintain permanent corporate records, including records of its

articles of incorporation, bylaws, resolutions, annual report, and all minutes of shareholders and

board of directors meetings and any actions taken without a meeting.  There is no evidence that

P&J even maintained corporate records, a basic requirement for a company that seeks limited

liability under Kentucky law.  In addition, there is no evidence that the actions carried out on

P&J's behalf by Richard and Pam Williams were authorized by corporate bylaws and or that the

Williams acted with corporate authorization.  *See U.S. v. WRW Corp.*, 986 F.2d 138, 143 (6th

Cir. 1993).  Moreover, P&J never paid a single dividend to Pamela Williams, its owner, but

instead paid the large "management fees" to both Richard and Pamela Williams, supporting a

finding that the Williams were using P&J's funds as the Williams' own. The record clearly

demonstrates that the separate funds held by P&J were commingled with the Williams' personal

45

accounts and/or were regularly used to meet their personal obligations.  The Williams clearly "siphoned off" funds from P&J.  Finally, the evidence shows that Richard and Pamela Williams personally guaranteed corporate liabilities for P&J.  Although the Plaintiffs have not produced evidence to support whether P&J was undercapitalized, the weight of the evidence supporting the other factors weighs in favor of a finding that there "was a complete merger of ownership and control" between P&J and the Williams.  *Id.*

That said, it was further the Plaintiffs' burden to prove some fraud or injustice resulting directly from the abuse of the corporate form.  *See Hodak v. Madison Capital Mgmt, LLC*, 348 F. App'x 83, 95 (6th Cir. 2009) (*citing White*, 584 S.W.2d at 61 and *Daniels v. CDB Bell, LLC*, 300 S.W.3d 204, 211 (Ky. App. 2009)).  The Plaintiffs have proven by clear and convincing evidence that the Williams committed fraud.  The Williams, under the guise of P&J, fraudulently induced the Plaintiffs to invest in well interests with P&J that have proven to be worthless or non-existent.  The Plaintiffs invested millions of dollars into P&J, which as reviewed above, the Williams converted for their own personal enjoyment and purpose.  Clearly, the Plaintiffs have now shown that the Williams, using P&J, caused them a fraud or injustice.

The Plaintiffs have also proven a direct link between the breach of contract by P&J and the Williams' misuse of the corporate form.  There is no evidence of any purpose for P&J other than to aid the Williams to fraudulently induce the Plaintiffs to invest in the wells at issue. There is no evidence of other investors besides the Plaintiffs.  It appears from the evidence at trial and P&J's bankruptcy record that P&J had no other significant operations beyond its purported "operation" of the Plaintiffs' wells.  It is virtually impossible to separate the operations of P&J from the Williams' conduct.

P&J existed as a vehicle that the Williams used to help them present a legitimate business enterprise to encourage the Plaintiffs to invest in wells that were worthless.   The breach of the 30 Month and 100 Mcf Guarantees, and the breach of the Operating Agreement,

are a direct result of the Williams' scheme to defraud the Plaintiffs while hiding behind P&J to

protect them from liability when P&J failed to perform on the contracts because, based on the

Williams' fraud, P&J could not.  Thus, the Court finds that the corporate veil of P&J should be

pierced and the Williams held personally liable for damages resulting from P&J's breach of

contracts with the Plaintiffs in addition to the damages incurred by their tortious conduct.

**G.    Reformation**

Finally, the Plaintiffs ask this Court to reform the Assignments to give the Plaintiffs

additional interests in the remaining wells for which they bargained because the Assignments do

not reflect the parties' intent.  Specifically, the Plaintiffs contend that the Assignments

mistakenly assign fifty percent (50%) of an eighty-one and one-half percent (81.5%) working

interest in a well instead of fifty-percent (50%) of a one hundred percent (100%) working

interest.

According to Mr. Miller, if a lessee intended to convey one-half the ownership interest in

a well to an investor, as was the intention of P&J and the Plaintiffs, then the correct percentages

of ownership interests assigned to the investor would be a 50% working interest and a 43.75%

net revenue interest.[23]  Despite this apparent industry-wide convention, the Assignments of the

Plaintiffs' well interests conveyed 50% of an 81.5% working interest[24] in a particular well.

Further, the various Assignments state that the relevant Fontaine investor would receive 75% of

the revenue from the well until the investor had recouped its investment in that particular well.

In Mr. Miller's opinion, the language of the Assignments does not comport with the industry

accepted customs.  As 50% owners of the well, he surmised each investor should have

---

[23] 100% - 12.5% (landowner royalty) = 87.5%/2 = 43.75%

[24] The reason this number is 81.5% and not 87.5% is because P&J assigned a 6% net revenue interest
directly to Pamela Williams in the form of an overriding royalty.

received 50% of 100% of the working interest in each well for a total of 50%.  Instead the

investor received only a 40.75% (50% of 81.5%) working interest in the wells.[25]

Mr. Carlson testified that he understood the Plaintiffs were to receive one-half interest in

the wells.  While Mr. Williams initially testified that he did not agree with Mr. Carlson's

understanding, following impeachment by his prior deposition testimony, he agreed that he

previously testified the agreement reached with Mr. Fontaine and the Plaintiffs was that the

investors were to own fifty percent of the well.

It is a well-settled principle of law that courts of equity have authority to reform contracts

consistent with the intentions and understanding of the party for fraud or mutual mistake.  The

evidence to sustain such interference with the contract must be clear and convincing, and the

fraud and mistake must be established with reasonable certainty.  *Mayo Arcade Corporation v.*

*Bonded Floors, Co.*, 41 S.W.2d 1104, 1108 (Ky. 1931); *see also Cadleway Properties, Inc. v.*

*Bayview Loan Servicing, LLC*, 338 S.W.3d 280, 287 (Ky. App. 2010); *Price v. Godby*, 263

S.W.3d 598, 602 (Ky. App. 2008).

Courts of equity generally will not give relief to the complaining party where the party has

the ability to discern the truth or falsity of the representation.  *Mayo Arcade Corp.,* 41 S.W.2d at

1108-1109. Furthermore, reformation of a contract, as a relief, will not be afforded where the

complaining party is negligent.  The law will not interfere to protect one from the result of his

negligence.  *Id.* at 1109.  In the context of mutual mistake, equity requires that the party who

seeks relief shall have exercised at least the degree of diligence which may be fairly expected of

a reasonable person.  *Id.*

Regardless of Mr. Williams' concession on cross-examination, consistent with Kentucky

law, the Court shall not reform the Assignments where the "mistake" is obvious. The Letter

---

[25] In a limited number of wells, the Plaintiffs were to receive 100% of the working interest in the well.  In
the Assignments for those limited wells, the working interest assigned was 100% of an 81.5% as well.

Agreements and the Assignments are part of a single real estate transaction.  This "mistake" is

patently clear on the face of the Letter Agreements, all of which were signed by Mr. Fontaine,

Mr. Carlson, and/or the other Plaintiffs.  The language in the Assignments mirrors the

corresponding Letter Agreements and thus the "mistake" is readily apparent on those

documents as well.  Thus, this Court will not grant relief to the Plaintiffs for a mistake that was

apparent on the face of the Letter Agreements and Assignments, regardless of Mr. Williams'

concession.

**<u>Conclusion</u>**

The foregoing constitutes the Court's findings of fact and conclusions of law.  In reaching

the conclusions found herein, the Court has considered all of the evidence, exhibits, and

arguments of counsel, regardless of whether or not they are specifically referred to in this

decision.  A separate judgment shall be entered accordingly.


Copies To:

Mary L. Fullington, Esq.

Karen Greenwell, Esq.

Billy Shelton, Esq.

James R. Westenhoefer, Esq.


49


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document
has been signed by the Judge and electronically entered by the Clerk in the
official record of this case.*



**Signed By:**
***<u>Tracey N. Wise</u>***
**Bankruptcy Judge**
**Dated: Tuesday, May 15, 2012**
**(tnw)**